## SECURITY OBTAINED BY DURESS AVOIDED.

Circuit Court of Cuyahoga County.

THE STATE BUILDING & LOAN COMPANY v. NETTIE E.
BAKER ET AL.[*]

Decided, January 29, 1900.

*Duress—When Criminal Prosecution Amounts to Duress—Arrest of
Brother May be Duress—Duress a Defense as Against Bona Fide
Purchaser of a Mortgage—Transferor of Negotiable Securities Pro-
cured by Duress Becomes Principal Debtor.*

1. Where a criminal prosecution is for the purpose of collecting a debt,
   it is commenced for an illegal and unlawful purpose, and although
   there may be a good cause for prosecution, and although the form
   of proceeding and the writ be perfect and without fault, yet the
   law will regard such a prosecution as duress and any security ob-
   tained through it may be avoided.
2. The arrest of a brother may amount to duress where a sister executes
   notes and mortgages to secure the debt of the brother and save
   him from criminal prosecution.
3. Where notes and a mortgage are obtained by duress and transferred
   to a *bona fide* purchaser for value before maturity, duress being a
   species of fraud, may nevertheless be set up as a defense to the
   mortgage.
4. Where one gives a note or mortgage under duress, even though it be
   for the purpose of preventing a criminal prosecution, that fact does
   not prevent the giver of the note or mortgage from defending an
   action brought upon it upon the ground of duress.
5. Where one who has obtained a note and mortgage by means of duress,
   transfers them to an innocent purchaser for value and before ma-
   turity, he thereby becomes the principal debtor and the maker be-
   comes the surety.

*Herrick & Hopkins,* for plaintiff.
*Boynton, Horr & Uhl, N. N. Cole* and *W. W Boynton,* contra.

CALDWELL, J.; MARVIN, J., and HALE, J., concur.

This case is before us on appeal from the common pleas court.

[*]Affirmed without opinion, *State Loan & Building Co.* v. *Baker et al,* 65
Ohio State, 564.

It seems that James B. Harrington was in the employ of Olmsted Brothers as a solicitor, and as a collector to some extent. Soon after he went in their employ they allowed him to retain monies or they loaned him monies or, perhaps, both, to the extent of several hundred dollars, and after he had been in their employ for some time, the Olmsted Brothers claimed to have found that he was appropriating to his own use other monies that ought to have been turned over to them. When they ascertained this fact, they attempted to get a settlement out of him for the entire amount that he owed them.

This settlement was pressed from time to time upon him, and each time he made promises that he would do something, but evidently his efforts in the direction of either payment or the giving of security for what he owed, including what he had lawfully received from them and what he had appropriated, all failed, and he was unable to make settlement and his promises became wearisome to the Olmsted Brothers. They called in their attorney and presented to him, not in a written form, but orally, the state of the claim between themselves and Mr. Harrington—as to that which had been loaned or was lawfully in his hands, as well as that which they claimed was unlawfully in his hands. The attorney went to his office and an arrest was made. Harrington was taken to the defendant, Nettie E. Baker, where she was teaching in this county, by the officer and she dismissed her school and went and signed the bail bond for Harrington.

This was on the 15th of March, and the case was continued until the 22d of. March; on the 22d it was continued until the 24th, but on the 22d of March there seems to have been a settlement of this claim, and Nettie E. Baker pledged property that was in her name and of which she was the owner, at least for the present I will say that, and the prosecution was dropped. The attorney of the Olmsteds went to the justice and told him that they would not appear; and when the day arrived for the trial neither the attorney for the Olmsteds nor the Olmsteds themselves appeared, and the prosecution was dismissed.

In settling this matter, Nettie E. Baker signed a number of notes amounting to some $1,617. She signed notes falling due

at stated periods in the future, and gave a mortgage on property to secure the notes. The notes and mortgage were by the Olmsteds soon after turned over to the plaintiff, the State Building & Loan Company, and was then and still is held by that company.

The first note became due and was not paid. There was an option in the mortgage to treat them all as due, if there was a default in the payment of one, and availing itself of the option of treating them all as due, and seeking to foreclose the mortgage on this property, this action was brought.

Nettie E. Baker answered, setting up duress, although that term is not used; yet the facts are set forth, and it is proper to treat the answer as setting up duress and setting up the compromise of this criminal prosecution; and, upon those two defenses, she claims that the Olmsteds have no rights against her and have no right against her by reason of her giving the note and mortgage to them. As to the bank, she claims that it was not a *bona fide* holder of the mortgage, and she claims that the bank can make no defense against her rights as far as the mortgage is concerned, and asks to have the Olmsteds brought in and that it be determined that as between her and the Olmsteds, Olmsted Bros'. liability upon the notes be primary, and hers only secondary to theirs. The Olmsteds endorsed the note to the State Building & Loan Company.

We have heard the evidence in this case, and the *purpose* of the criminal prosecution is the first question in order to be considered.

It seems that when the Olmsteds ascertained the fact that Harrington had been taking from them and appropriating to his own use moneys that belonged to them, they did not attempt to get him to turn back to them or secure to them the amount that he had illegally appropriated, but made the attempt to collect their entire claim, and seem, as between them and him, according to the testimony, to have attempted to make his settlement before arrest the settlement of the entire claim or none of it. In Mr. Olmsted's testimony upon this matter he at no time mentions anything but the settlement of the *entire* claim. When the attorney went to the office of the Olmsteds, at the time he was first

called, the entire claim was presented to him and, while not put in his hands in the form of an account, yet he at that time, and at no other time, so far as the testimony shows, ascertained the exact amount that was loaned or was legally in Harrington's hands, and the amount that he had illegally appropriated.

The prosecution was commenced for criminally appropriating a part of this money. When Mr. Harrington was arrested he was taken by the officer who arrested him a considerable distance into the country, to the school-house where his sister was teaching, and she was given to understand that he was under arrest and that she was needed to bail him. She came into the city and gave bail.

One of the Olmsted Brothers testifies, substantially, that is, he admitted he so testified before and does not deny but it is true now, that the understanding between himself and brother and their attorney was, that this prosecution would be commenced and allowed to stand for a while—to hang in that condition.

The first attempt at any settlement is a little uncertain. Some of the witnesses place it immediately after the giving of bail, or very soon after; other witnesses place it after the continuance—after the first time the suit was set for trial, and it is not very clear just when the negotiations commenced to settle this claim; nor is it certain how long Mrs. Baker had to consider this matter, after it was first presented to her—I mean, the matter of her mortgaging her property.

The method in which Mr. Olmsted undertook to settle this claim—before criminal action was commenced against Mr. Harrington; the fact that the conclusion between the attorney and the Olmsteds was to commence the action and let it lie, let it rest, taken with what followed, shows that this action was commenced, not for the purpose of bringing into action the strong arm of the criminal law of the state for the proper purposes, but for the purpose of collecting that debt. The prosecution, therefore, was commenced for an illegal and unlawful purpose; and, as we understand the law, if it is commenced for an illegal and unlawful purpose, although there be good cause for prosecution and although the form of commencing the prosecution and the

writ be perfect and without fault, yet the law will not uphold such a prosecution and it will be regarded as duress. Out of many cases we have seen, I submit the language used in the case of *Osborn* v. *Robbins et al*, 36 N. Y., 365. I read from the opinion on page 371:

"The note was executed when the principal defendant was a prisoner; and it could not be enforced by the payees if they obtained it through an abuse of legal process, for purposes of oppression and exaction. When a party is arrested without just cause, and from motives which the law does not sanction, any contract into which he may enter with the authors of the wrong, to procure his liberation from restraint, is imputed to illegal duress. It is corrupt in its origin, and the wrong-doer can take no benefit from its execution.

"In such a case, the element of voluntary assent is wanting. The parties do not meet on equal terms. The authority of the courts is perverted to unworthy uses. The instrumentalities employed to produce a consenting will are force and fraud, agencies which the law abhors. The prisoner is at the mercy of the accuser, and he submits to extortion, as the means of deliverance from oppression under the forms of law.

"The party who exacts a security from one whom he wrongfully restrains of his liberty, can derive no aid from the fact that the claim which he enforced by illegal means was just."

The next question to be considered is whether Mrs. Baker stands in such relation to this matter that she can avail herself of the defense of duress.

It has been laid down that coercing a father or using duress upon a father to secure a note given by a child, and *vice versa* avoids the note, and one authority says that there is no doctrine limiting that rule; that the courts have only talked about a limitation, as between blood relatives because of the fact that some courts had laid down that the rule might extend to a son who had been coerced into giving security to relieve his father from imprisonment, or *vice versa*, and that no rule had ever been established by any court saying it should never be extended beyond that. So far as my observation goes, that is so. It has been extended in Illinois to a grandmother who was coerced into giving security to save her grandson; and, in Wisconsin, to a sister giving security to relieve her brother from imprisonment; and

it seems to be extended to all cases where there is intimate rela-
tion, blood relationship, between the parties, if the coercion is
sufficient to overcome the will of the party giving the security.

We do not hesitate to hold upon all of these authorities, that
Mrs. Baker can avail herself of this as completely as could her
brother had he given notes and security instead of her; and that,
if she gave this security to save her brother from imprisonment;
if she did it to relieve him from an unlawful imprisonment she
can avail herself of the defense she sets up in this action. But
it is contended that she had time for deliberation in this matter,
and that having had time for deliberation, must now be inferred
that the circumstances under which she gave this security did
not deprive her of her free-will; but, having done it after time
for deliberation, that the matter is supposed to have been done
voluntarily on her part.

The class of cases holding this doctrine, almost all of them
are cases where the party makes some payment *after* delivery
of the security or note, or does some act, *after* the matter is
settled in court to carry out the contract that he had entered
into, *after* the time when the restraint or the impending calamity
that is about to befall the party, has passed away and gone.
And there are one or two cases where the party had time for
deliberation and counsel with attorneys and friends, and then
went and did it. But I find no case like *this;* and, as I have al-
ready stated, the testimony is very uncertain as to the time Mrs.
Baker had to deliberate about mortgaging her property. I speak of
*mortgage,* as that is the principal matter. The note was rejected
when she offered to give her note; that was not relied upon; it
was the property that was relied upon in this matter—that
was the real gist of the matter. It is not known from this testi-
mony, whether it was one hour or two hours or three hours that
she had as time to deliberate whether she would mortgage that
property or not. It is not known whether the pressure was con-
tinued or increased up to the very moment when she gave the
mortgage; but, evidently, she gave it under that pressure, and
we believe she was deprived of her free-will, when she gave it,
by the pressure brought to bear, the arrest of her brother and

likely the imprisonment of him, and whatever was said in regard to the settlement of the matter in her presence.

Having found these facts in the case, and the law as I have stated, the question now remains, what can she do?

It is claimed that this mortgage is in the hands of an innocent holder. But we have a case in this state, *Baily* v. *Smith et al*, 14 O. S., 396, which holds that while notes may be in the hands of an innocent holder and fraud can not be set up against the innocent holder of the notes, that is not true as to the mortgage. This is different from the holdings in the United States courts and in most of the states, though not in all. This was a decision made by Judge Ranney and is good law in this state and has never yet been overruled. Whether the Supreme Court would extend it beyond a case of fraud we know not, and we need not consider it in this case for the reason that duress is a species of fraud; it is obtaining property or money against the will of the party, and fraud is exercised only to overcome the will of parties wrongfully, and duress is only to overcome the will of a party wrongfully or by fear; one is through confidence—the other through fear. They are so related that duress is a species of fraud.

This being true, and following the decision I refer to, we must hold in this case that the State Building & Loan Company can make no more defense to this action than could the Olmsteds and can maintain no action upon the mortgage as against Mrs. Baker that the Olmsteds could not maintain.

But it is strenuously contended in this case on one side, and, upon the other side, as strenuously the other way, that there was no illegal settlement of this matter; and the attorney who settled the matter with Harrington and his sister, Mrs. Baker, is brought in to testify, and we, all of us, believe him to be a person of the utmost veracity and would not hesitate to believe anything to which he would testify. We might believe that he was mistaken, but his testimony in this case is largely a matter of argument in his own mind. Many of the things that he testified to are matters that he testifies to from his mode and method of doing business and what he now thinks he would have done under the circumstances; and his recollection is poor; he is mixed up

in his dates; he is mixed up in the order in which the circumstances occur—it is a matter of want of recollection; at the time this matter was disposed of, he dismissed it from his mind, no doubt he went into many other things; and under all the circumstances of the case, it is not surprising that he should forget much of the detail of the matter and much of the conversation.

Mrs. Baker testifies to certain matters and conversations between her and the attorney. The attempt is made to show that such did not take place as testified by her, at any such time; but the attorney is evidently very much mixed up as to the time when he undertook to say it did occur; but it is almost evident, under the circumstances of this case, that it must have occurred at an earlier date than he said. He testifies that he told Harrington, at the commencement of negotiations, that, of course, he could not make any arrangement or agreement to dismiss the criminal prosecution against him or not to prosecute him. Evidently, to call forth that remark on his part, there must have been some consideration upon that matter, or we see no reason why he was called upon to state that. Of course a person in negotiating under the circumstances he did, may have had more or less fear that such a result might be inferred and might, as a precaution, make a statement of that kind. Harrington testifies to a conversation on the same matter with the Olmsteds, which is denied. But, when we take into consideration the method in which the Olmsteds undertook, in the first place, to collect their claim; when we take into the consideration the method of prosecution—to have it commence and then have it lie along; when we take into consideration that the day before the trial was to begin, their attorney went to the justice and said they would not appear to prosecute and they did not appear when the trial was to commence and it was dropped entirely; when all these facts and circumstances are brought to bear upon this matter—and the poor recollection of the attorney, and the hesitating manner in regard to this matter, in which the Olmsteds testify; we believe that Mrs. Baker was given to understand, and the Olmsteds and their attorney meant that she should understand, perhaps, not by express words, but by actions, and by their conduct taken

in connection with what was said, that if she mortgaged her property and secured this claim, the prosecution would be dropped.

But it is contended that there was nothing said or done in this matter that would influence her. I have already noticed the fact that it is claimed she had time for deliberation.

Mrs. Baker, who was once married, has a child fifteen years old, and after she became a widow, she went to teaching school in this county, and had bought a lot and, with the aid and assistance of her father, had undertaken to put a building on it, and was struggling to make a home for her people and pay off the debt she had incurred in getting this home. It was to her a most important thing that she should be able to continue her occupation as a teacher; she had the care and support of her aged parents; and the continuing of her occupation that she might pay her debts, and make a livelihood for herself, and child and parents was at stake, and it was important to have no blot upon herself and her family. She was situated in such a way that her will would be easily overcome. Taking all these things into consideration, we believe that this lady acted without any free will, but under the pressure placed upon her by these threats and the fear of imprisonment for her brother.

Now it is contended that if the criminal prosecution was not conducted, these parties, both of them, are guilty of a criminal act in suppressing a criminal prosecution.

But this rule applies only where the parties act under a free will. There is no *parum delictum* where this is not true. We have already found that she did not act under a free will. Not acting under a free will, but under compulsion, how can there be a guilty act on her part? And if she is not guilty of committing a crime, none can be imputed to her in this matter, and, therefore, not being guilty of a crime, she may avail herself of the defense of duress.

I may say I have found a large number of cases cited in the brief where this doctrine is stated: That a party who acts under compulsion and makes a contract where the case results in being dropped, the party does *not* stand in *parum delictum* with the other parties.

She may, then, in this action, have whatever affirmative relief she is entitled to, and as against the plaintiff, the State Building & Loan Company, and, as against the Olmsteds, she is entitled to have this mortgage canceled, it being not void, but only voidable.

Furthermore, we think she is entitled, and we so hold in this case and the decree may be so drawn, that the Olmsteds, by means of fraud and duress practiced upon her, are the principals in this debt and she is the surety.

There is one other matter that the court ought to speak of. As we may be called upon to make findings of fact, we ought to state the father's interest in the property. The testimony is all one way upon this matter, and that is, that the daughter bought this lot and paid for it. The title was taken in her name, with an agreement with her parents, that she would help to raise the money to pay for it and build a house and her father would help by contributing his work, he being a carpenter, and he would do all he could; a house should be erected on the lot, and it should be the home or place of residence for the father and mother while they lived, and, after their death, the property and the possession thereof should be in Mrs. Baker.

It is claimed that that can not give to the father a life estate, because of certain relations between them as to their both living there and both having a home there; and that she can turn him out. We do not believe that she can turn her father out of that home, under that contract. We think that he has for a valuable consideration obtained an interest in that property, and that this interest is an interest that equity will recognize as an interest in the property, or that it is a life estate. There being no deed to him for life, it is a strong equity at least, one that he could enforce, not only against her, but against any one that acquired an interest in the property with notice of his rights.

Now, as to notice of his rights. He lived there; Mrs. Baker lived there; she went away to school early in the morning, but she was there every Sunday, and the father and mother lived there. And yet it is claimed that the way in which they lived, would be notice to no one.

Now, the mere fact of his living there is notice that he is living on the property in some way, under some claim, or with his daughter, however it may be. But there is enough, in our judgment, to put any one who knows that much, upon inquiry as to his rights; and whatever that inquiry may devolop, the parties must be charged as knowing. This is an old rule in equity; and the bank, therefore, and the Olmsteds must be charged with knowing his rights there as fully as Mrs. Baker knew them. That being true, we think he has a right in that property that can be protected as against the mortgage.